# Exhibit B

# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| BRITTANY ALON, JASMINE THOMAS, | ) | CAUSE NO.:    1:24-cv-0334 |
| ANA RAMOS, MEGAN EFSEAFF, SARA KIPP, | ) | |
| KEVIN DANIELS, JENNIFER ROTHROCK, | ) | |
| ELIZABETH HILTON, CHELSEA MANNION | ) | |
| VANESSA TORTORA, individually and on behalf | ) | |
| of similarly situated students, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE: |
| v. | ) | |
| | ) | |
| UNION INSTITUTE AND UNIVERSITY, | ) | |
| EDGAR L. SMITH, JR., DR. JEFFREY M. | ) | |
| SHEPARD, DONALD FELDMAN, ROGER | ) | |
| ALLBEE, KAREN BIESTMAN, DR. GLADYS | ) | PLAINTIFFS' CLASS ACTION |
| GOSSET HANKINS, DR. EDWIN C. MARSHALL, | ) | COMPLAINT AND DEMAND |
| CHRISTINE VAN DUELMAN, AND | ) | FOR JURY TRIAL |
| DR. KAREN SCHUSTER WEBB, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs, by counsel, allege against Defendants as follows:

## I.    PARTIES

1.    Plaintiffs, Brittany Alon, Ana Ramos, Jasmine Thomas, Rebecca White, Megan Efseaff, Kevin Daniels, Sara Kipp, Elizabeth Hilton, Chelsea Mannion, Vanessa Tortora, and Jennifer Rothrock ("Plaintiffs" or "Class Representatives") are or were students at Defendant Union Institute and University ("Defendant Union") located in Cincinnati, Ohio, at all relevant times to this Complaint.

2.    Defendant Union is an Ohio non-profit corporation with a principal place of business in this judicial district.

3.    Defendants Edgar L. Smith, Jr., Jeffrey M. Shepard, Donald Feldmann, Roger Allbee, Karen Biestman, Gladys Gosset Hankins, Edwin C. Marshall, Christine Van Duelman (collectively,

the "Board Defendants") are or were members of the Board of Trustees of Defendant Union, which is the governing body with ultimate oversight of Defendant Union..

4.      Defendant Karen Schuster Webb ("Webb") is the President of Defendant Union.

## II.    **INTRODUCTION**

5.      The above-named Plaintiffs bring this lawsuit on behalf of themselves and all similarly situated students at Defendant Union.

6.      Defendants subjected Plaintiffs and all other similarly situated students to the same policies and procedures for students attending Defendant Union.

7.      At all relevant times to this Complaint, Defendant Webb was acting in her official capacity as President of Defendant Union.

8.      At all relevant times to this Complaint, Board Defendants were acting in their official capacity as the Board of Trustees for Defendant Union.

9.      Defendants have breached contractual obligations to Plaintiffs in violation of Ohio Common Law.

10.     Defendants are estopped from denying promises made to Plaintiffs under Ohio Common Law.

11.     Defendants are liable for the tortious interferences with Plaintiffs' contracts for the misrepresentations made by Defendants regarding Plaintiffs' education.

12.     Defendants are liable for negligence regarding Plaintiffs' education.

13.     Defendants are liable for negligent misrepresentations made by Defendants regarding Plaintiffs' education.

14.     Defendants are liable for the acts of gross negligent conducted by Defendants' misrepresentations made regarding Plaintiffs' education.

15.     Plaintiffs herein assert their right to relief jointly and severally in that their claims arise out of related transactions and occurrences and arise out of the same questions of law in accordance with Rule 18 of the Federal Rules of Civil Procedure.

16.     Plaintiffs herein assert their right to relief jointly and severally in that the number of Plaintiffs is sufficient to support a class action, their claims are typical on one another, a class action is superior to other methods available for the fair and efficient adjudication of the controversy and that the named Plaintiffs will adequately represent the interest of all class members in accordance with Rule 23 of the Federal Rules of Civil Procedure ("FCRP").

17.     Plaintiffs seek declaratory, injunctive, compensatory, economic, liquidated, punitive and other relief against Defendants to redress violations of Plaintiffs' common law rights.

### III.    JURISDICTION AND VENUE

18.     Plaintiffs bring this action as a class action pursuant to FCRP 23 on behalf of themselves and other members of a class(es) of persons, defined herein, who assert factually related claims pursuant to the Class Action Fairness Act of 2005 ("CAFA") 28 U.S.C § 1332(d)(2)(A).

19.     The amount in controversy exceeds $5,000,000.00 in the aggregate, exclusive of interest and costs, and is a class action in which at least one member of Plaintiffs is a citizen of a different state from any Defendant. Plaintiffs have a good faith basis to belief Defendants are insured for at least $5,000,000.00.

20.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(1). Defendant Union's principal place of business is in Cincinnati, Ohio.

### IV.    FACTUAL ALLEGATIONS

21.     On or about July 1, 2018, Defendant Webb was hired as Defendant Union's sixth President since its inception in 1964. At the time of Defendant Webb's hiring, Defendant Union had roughly a $6.3 million budget surplus and a $3 million dollar endowment.

22.    In 2019, after Defendant Webb's first year as President of Defendant Union, the university had a decline in revenue of 20% and posted a $1.7 million loss.

23.    In 2020, Defendant Union's annual losses increased to $2.6 million. An auditor of Defendant Union raised substantial doubts about Defendant Union's ability to continue operating.

24.    In 2021, three years after Defendant Webb took over as President, Defendant Union was forced to sell its headquarters. On or about July 2021, Defendant Union sold the building and additional land for a loss.

25.    COVID-19 allowed Defendant Union to receive $4.1 million in federal grants in 2021 and 2022, compared to the $535,000 in previous years. This boosted 2021's revenue 16%. Despite the boost in revenue, Defendant Union still lost $794,018 for the year.

26.    During Defendant Webb's Presidency, Defendant Union was subject to a 41% decrease in revenue from tuition and fees while program service expenses increased. Defendant Union's total student headcount dropped 36% and the full-time enrollment dropped 69% from 2017 to 2021.

27.    In 2022, Defendant Union lost $539,668. This brought the total losses under Defendant Webb's leadership to $5.6 million. After four years with Defendant Webb as its President, Defendant Union had $5 million less in cash than when she first took over and the endowment dropped to only $2.1 million.

28.    On or about April of 2022, Defendant Union established a line of credit with Fifth Third Bank in 2022 that had to be paid off by January of 2023. Plaintiffs do not know the status of this loan.

29.    Board Defendants oversee all operations at Defendant Union, including Defendant Union's finances, fiscal responsibility, payroll practices, policies, and procedures, and the job

performance of Defendant Webb.  Defendant Webb is the President of Defendant Union and oversees the agenda of Board Defendants.

30.     In June 2023, faculty and staff at Defendant Union took a vote of no confidence regarding Defendant Webb.  Board Defendants took no corrective action.

31.     On or about August 14, 2023, Defendant Union sent an email indicating a "UI&U Sustainability and Revitalization Team" was created to assist the university in "crisis management decision-making of the university and enhance the communication and information sharing between administration, faculty, staff, and students."

32.     On or about August 24, 2023, Defendant Union sent an email to Plaintiffs indicating classes for Fall One Semester classes were postponed and would resume on September 11, 2023. Defendant Union also indicated Fall Two Semester Classes would begin on November 6, 2023. Plaintiffs relied on these representations by Defendant Union.

33.     Additionally, Plaintiffs have become aware that in August of 2023, the University of Cincinnati reached out to Defendant Union about a possible partnership and/or teach-out opportunity for students. This gracious opportunity from the University of Cincinnati included expedited and mid-semester admission and fee waivers. However, Defendants did not engage in negotiations with the University of Cincinnati.

34.     On or about August 28, 2023, Defendant Union sent Plaintiffs an email indicating it was not too late for students to purchase books for the semester. Plaintiffs relied on this representation from Defendant Union that the university would not cancel classes.

35.     On or about September 6, 2023, Defendant Webb, in her capacity as President of Defendant Union, held a town hall event to discuss Defendant Union's next steps.

36.     On or about September 7, 2023, the Higher Learning Commission designated Defendant Union in financial distress. A true and accurate copy of the Public Notice of Financial

Distress by the Higher Learning Commission (the "Public Notice") is attached hereto, incorporated herein, and marked as **Exhibit "A"**. The Public Notice states a "focused visit" was scheduled for October 23, 2023, where the Higher Learning Commission would determine the fate of Defendant Union's accreditation status. Ex. A.

37.     On or about September 8, 2023, Defendant Union sent an email indicating Fall One Semester was cancelled. Further, Defendant Union indicated Fall Two Semester classes would still occur. Specifically, Defendant Union stated:

> Union pledges to take care of each of its students. It is our intent to continue your program during Fall 2 into future terms. Be assured that all registered students will be able to complete their programs. We ask for your continued patience and respect. Your hard work and dedication will be recognized and honored.

Plaintiffs relied on this representation by Defendant Union by not transferring to other schools. Defendants knew Plaintiffs would rely on their representation.

38.     On or about September 27, 2023, Vice President of Academic Affairs, Tom Federick, held a town hall meeting to discuss Defendant Union's situation with students and faculty.

39.     On or about October 3, 2023, a letter containing the signature of more than fifty (50) doctoral students at Defendant Union called for the resignation of Defendant Webb and the replacement of Board Defendants. The letter requested that Defendant Webb resign due to her creation of and subsequent failure to address the financial crisis, transparency and empathy toward everyone effected by Defendants' actions. Defendant Webb and Board Defendants are currently still affiliated with Defendant Union.

40.     On or about October 23, 2023, the Higher Learning Commissions conducted its "focused visit" to determine whether Defendant Union's accreditation will be revoked.[1] The Higher

---

[1] Plaintiffs are unaware of any official ruling by the Higher Learning Commission regarding the status of Defendant Union's accreditation at this time; however, Plaintiffs have a good faith basis to believe a second visit by the Higher Learning Commission took place in March or April of 2024.

Education's visit came approximately four (4) to five (5) years before Defendant Union was up for reaffirmation of accreditation. A true and accurate copy of the Reaffirmation Action Letter to Defendant Union on May 5, 2017, is attached hereto, incorporated herein, and marked as **Exhibit "B"**.

41.　　On or about November 1, 2023, Defendant Union sent an email to Plaintiffs indicating Fall Two Semester for undergraduates and master's programs were cancelled, but that courses would resume in January. Fall One Semester and Fall Two Semester classes never occurred. However, many Professors refused to abandon their students and continued to teach several classes across multiple programs.

42.　　On or about November 7, 2023, the United States Department of Education ("DOE") sent a letter to Defendant Webb indicating the DOE was instituting an emergency action to terminate Defendant Union's eligibility to participate in Title IV programs. A true and accurate copy of the DOE letter to Defendant Webb is attached hereto, incorporated herein and marked as **Exhibit "C"**.

43.　　By information and belief, Plaintiffs assert that Defendants received funds for Plaintiffs' tuition and that Defendants did not distribute the amount in excess of tuition to each Plaintiff, as required by federal law. Ex. C at 2.

44.　　The DOE stated, "on August 8, 2023, [Defendant Union] identified a total of $753,374 in outstanding Title IV credit balances that were owed to 157 students." Ex. C at 4.[2] These funds, and others, were due to Plaintiffs from May 2023 to August 2023. Ex. C at 4.

45.　　Defendants' unlawful actions not only affect those with federal student loans but also many Plaintiffs with private student loans who did not receive the refund owed to them for loans in excess of tuition.

---

[2] The DOE letter states there are 390 students entitled to Title IV program credit balances and only 50 students were paid their credit balances.

46.    On or about November 2023, Defendant Union indicated it would use November and December to reorganize and restructure to "Become a Better Union."

47.    The cancellation of both Fall One and Fall Two Semesters has made Plaintiffs unable to demonstrate their enrollment status with various loan servicing agencies. These loan servicing agencies have notified Plaintiffs that loan payments are due as early as January and interest will begin to accrue on subsidized loans.

48.    On or about December 2023, Defendant Union indicated a teach-out program with various universities was available to students. Defendant Union assured students that the universities would accept all their credit hours to date. However, many Plaintiffs have indicated that is not true. Many Plaintiffs will be required to retake courses already completed at Defendant Union. Further, many Plaintiffs were denied access to financial aid for the teach-out programs due to the status of their loans with Defendant Union. These Plaintiffs are forced to pay out-of-pocket or take out private loans at an interest rate greatly exceeding that of federal loans, to finish their degree.

49.    Many Plaintiffs have yet to receive their Diplomas from Defendant Union as they have not met the required credit hours. Many Plaintiffs have not been able to finish their schooling by December, as originally planned and are now forced to graduate several months later, if at all.

50.    Many Plaintiffs are unable to receive transcripts from Defendant Union to apply to other schools or apply for graduate schools.

51.    Many Plaintiffs have been forced to put post-graduate jobs on hold until they graduate, which could potentially span into next fall or later. Many Plaintiffs have lost job opportunities. Many Plaintiffs have lost money they paid out of pocket for tuition at Defendant Union. The entire situation Defendants have put Plaintiffs into has caused severe emotional distress that have many students wondering if they will ever get their degree, if their degree will be worth anything after the DOE

investigation concludes, and uncertainty as to where they will finish their educations. Many Plaintiffs have been living in agony waiting for what the future might hold for them and their families.

52.    As a result of the Defendants actions, Plaintiffs have suffered numerous injuries, which include but are not limited to lost opportunities, emotional pain and suffering, psychological pain and suffering and substantial monetary injury.

## V.    CLASS ACTION ALLEGATIONS

53.    Plaintiffs incorporate paragraphs 1 through 52 by reference herein.

54.    Plaintiffs bring this action under various state law claims as a class action pursuant to Rule 23 of the FRCP on behalf of the following defined class:

> All persons who are or were students at Union Institute and University from January 1, 2023, to the present who have been adversely affected by the university's actions that have caused the university to be in financial trouble.

(the "Student Class").

55.    Plaintiffs bring this action under various state law claims as a class action pursuant to Rule 23 of the FRCP on behalf of the following defined subclass of the Student Class:

> All persons who are or were students at Union Institute and University from January 1, 2023, to the present who are involved in teach-out programs not accepting all of Defendant Unions credits.

(the "Teach-out Class #1").

56.    Plaintiffs bring this action under various state law claims as a class action pursuant to Rule 23 of the FRCP on behalf of the following defined subclass of the Student Class:

> All persons who are or were students at Union Institute and University from January 1, 2023, to the present who are involved in teach-out programs not providing financial aid.

(the "Teach-out Class #2").

57.    Plaintiffs bring this action under various state law claims as a class action pursuant to Rule 23 of the FRCP on behalf of the following defined subclass of the Student Class:

All persons who are or were students at Union Institute and University from January 1, 2023, to the present who have not received their diploma after graduation.

(the "Diploma Class").

58.   Plaintiffs bring this action under various state law claims as a class action pursuant to Rule 23 of the FRCP on behalf of the following defined subclass of the Student Class:

All persons who are or were students at Union Institute and University from January 1, 2023, to the present who have not received their transcript after requesting and paying for one.

(the "Transcript Class").

59.   <u>Numerosity</u>: Upon information and belief, the proposed Student Class, Teach-out Class # 1, Teach-out Class # 2, Diploma Class and Transcript Class ("Student Class and subclasses") are so numerous that joinder of all members is impractical. The Class Representatives are informed and believe, and on that basis allege, that during the applicable statutory period, Defendants have over 100 people who satisfy the definition of the proposed Student Class and subclasses.

60.   <u>Typicality</u>: The Class Representative's claims are typical of the members of the Student Class and subclasses. The Student Class and subclasses are similarly situated students suffering from similar damages due to Defendants' actions causing them to not receive reimbursement for loans in excess of tuition and/or having difficulty providing proof of enrollment to loan servicing agencies, having to retake classes or being required to take additional classes at the teach-out universities, never receiving their diploma after graduating and never receiving their transcript after requesting and paying for one to apply to new schools and/or graduate programs.

61.   <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in each of the Plaintiffs' causes of action where individual Plaintiffs lack the financial resources to vigorously prosecute separate lawsuits in federal court against the Defendants.

62.　　Adequacy: The Class Representatives will fairly and adequately protect the interests of the Student Class and subclasses and have retained counsel experienced in collective and/or class action litigation.

63.　　Commonality: Common questions of law and fact exist to all members of the Student Class and subclasses and predominate over any questions solely affecting individual members of the Student Class and subclasses, including but not limited to:

　　a.　Whether Defendants breached their contractual obligations to the Student Class and subclasses by failing to provide reimbursement for funds received in excess of the cost of tuition, their diploma after graduating and their transcript after requesting one to apply to new schools and/or graduate programs;

　　b.　Whether Defendants are estopped from denying the Student Class and subclasses reimbursement for funds received in excess of the cost of tuition, adequate teach-out opportunities to finish their degrees, their diploma after graduating and their transcript after requesting one to apply to new schools and/or graduate programs;

　　c.　Whether Defendants tortiously interfered with the contracts entered into with the Student Class and subclasses by demonstrating a conscious disregard for the rights of the Student Class and subclasses which disregarded the great probability of causing substantial harm to them;

　　d.　Whether Defendants negligently misrepresented that classes would resume, reimbursements for funds in excess of tuition would be provided, adequate teach-out opportunities accepting all of the members of the Student Class and subclasses credits and that diplomas and transcripts would be provided demonstrating a conscious disregard for the rights of the Student Class and subclasses and that disregard had a great probability of causing substantial harm to them; and

e.   Whether Defendants committed gross negligent conduct by representing to the Student Class and subclasses that classes would resume, reimbursements for funds in excess of tuition would be provided, adequate teach-out opportunities accepting all of the Student Class and subclass members credits and that diplomas and transcripts would be provided demonstrating a conscious disregard for the rights of the Student Class and subclasses and that disregard had a great probability of causing substantial harm to them; and

f.   Whether Defendants committed negligence by failing to provide diplomas and transcripts to the members of the Student Class and subclasses.

64.     This matter is maintainable as a class action under Rule 23(b)(1) of the FRCP. Prosecution of actions by individual members of the Student Class and subclasses would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendants.

65.     Class certification is also appropriate under Rule 23(b)(2) of the FRCP. Defendants have refused to act on grounds that apply generally to the class and final injunctive relief or corresponding declaratory relief is appropriate respecting the Student Class and subclasses as a whole.

66.     Further, Student Class and the subclasses certification is also appropriate under Rule 23(b)(3) of the FRCP. Questions of law and fact common to the Student Class and subclasses predominate over any questions affecting individual members of the Student Class and subclasses. A class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' common and uniform actions denied Student Class reimbursement for funds received in excess of tuition, to which the Student Class was entitled to. Defendants' common and uniform actions denied Teach-out Class # 1 the full extent of the credits the class members are entitled to. Defendants' common and uniform actions denied Teach-out Class # 2 the benefit of receiving

financial aid from schools Defendants have teach-out agreements with. Defendants' common and uniform actions denied the Diploma Class the benefit of receiving their diploma after graduating from Defendant Union. Defendants' common and uniform actions denied the Transcript Class from receiving transcripts after requests were submitted in order to apply to different schools and/or graduate schools. The damages suffered by the individual members of the Student Class and subclasses are small compared to the expense and burden of individual prosecution of this litigation. In addition, class certification is superior as class certification will obviate the need for unduly duplicative litigation that might result in inconsistent judgments regarding Defendants' actions.

67.      Plaintiffs intend to send notice to all members of the Student Class and subclasses to the extent required by Rule 23 of the FRCP.

68.      Defendants willfully engaged in a pattern of violating Federal and State law as described in this Complaint by failing to provide reimbursements for funds Defendants received from Class members in excess of tuition, failing to provide adequate teach-out opportunities for the Student Class and subclasses, never providing members of the Student Class and subclasses with their diploma after graduating and never providing members of the Student Class and subclasses with their transcript after requesting and paying for one to apply to new schools and/or graduate programs, for which members of the Student Class and subclasses are entitled to.

## VI.     <u>STUDENT CLASS CLAIMS</u>

## <u>COUNT ONE: BREACH OF CONTRACT</u>

69.      Student Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

70.      Student Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Student Class Plaintiffs education at Defendant Union.

71.      Upon acceptance of the contracts by both Student Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

72.     Student Class Plaintiffs filled out Free Applications for Federal Student Aid ("FAFSA") to receive the benefit of an education from Defendant Union through federal loans. Many Student Class Plaintiffs filled out applications for private student loans. Many Student Class Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Each Student Class Plaintiff has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

73.     Under the terms of the contract between Student Class Plaintiffs and Defendant Union, any funds received in excess of tuition is to be reimbursed to Student Class Plaintiffs to assist in paying living expenses. Defendants used these funds to pay for Defendant Union's other debt.

74.     Since at least May of 2023, Defendant Union has failed to fulfill its obligations under the contract requiring them to provide each Student Class Plaintiff with an education. Many Student Class Plaintiffs have not received any education since at least August 2023 nor any reimbursement from Defendants. The Student Class Plaintiffs who received their reimbursement received it late by several weeks.[3] Many Student Class Plaintiffs paid tuition out-of-pocket and have not received an education.

75.     Since Defendant Union breached their contract with Student Class Plaintiffs, Student Class Plaintiffs have been unable to prove their student status with loan servicing agencies. Many Student Class Plaintiffs now have money added to their loans that paid for an education they never received, causing financial harm to Student Class Plaintiffs. Many Student Class Plaintiffs have lost out-of-pocket payments.

76.     Due to Defendant Union's breach of the contract and Defendants usage of Student Class Plaintiffs fund to pay for other debts of Defendant Union, Student Class Plaintiffs seek

---

[3] Exhibit C states 50 of the 390 students who received federal loans were paid late.

declaratory and injunctive relief requiring Defendants to pay Student Class Plaintiffs back the money provided to them since May of 2023 for the benefit of providing a college education.

**COUNT TWO: PROMISSORY ESTOPPEL**

77.     Student Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

78.     Student Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Student Class Plaintiffs education at Defendant Union.

79.     Upon acceptance of the contracts by both Student Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

80.     Student Class Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendants through federal loans. Many Student Class Plaintiffs filled out applications for private student loans. Many Student Class Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Many Student Class Plaintiffs paid out-of-pocket for classes that were never taught. Each Student Class Plaintiff has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

81.     Under the terms of the contract between Student Class Plaintiffs and Defendant Union, any funds received in excess of tuition is to be reimbursed to Student Class Plaintiffs to assist in paying living expenses. Defendants used these funds to pay for Defendant Union's other debts.

82.     Since at least May of 2023, Defendant Union has failed to fulfill their obligations under the contract requiring them to provide each Student Class Plaintiff with an education. Many Student Class Plaintiffs have not received any education since at least August 2023 nor any reimbursement from Defendant Union. The Student Class Plaintiffs who received their reimbursement received it late by several weeks.

83.     On or about August 24, 2023, Student Class Plaintiffs were notified by Defendant Union that classes for Fall One Semester classes were postponed and would resume on September

11, 2023. Further, Defendant Union indicated Fall Two Semester Classes would begin on November

6, 2023. Student Class Plaintiffs relied on these representations by Defendants.

84.     On or about September 8, 2023, Student Class Plaintiffs received an email indicating

Fall One Semester Classes were cancelled.

85.     On or about November 1, 2023, Student Class Plaintiffs received an email indicating

Fall Two Semester classes were cancelled.

86.     Student Class Plaintiffs detrimentally relied on Defendant Union's continued promises

that Fall One and Fall Two classes were going to occur. Defendants knew Student Class Plaintiffs'

reliance was going to occur based on their representations that classes would resume and

reimbursements would be sent to each Student Class Plaintiff.

87.     Many Student Class Plaintiffs never received their reimbursement for student loans

paid to Defendant Union in excess of tuition because Defendants used the funds to pay for Defendant

Union's other debts. Many Student Class Plaintiffs who paid out-of-pocket have never received

refunds.

88.     Since Defendant Union has breached their contract with Student Class Plaintiffs,

Student Class Plaintiffs have been unable to prove their student status with loan servicing agencies.

Many Student Class Plaintiffs have money added to their loans that paid for an education they never

received and that include reimbursement amounts in excess of tuition that never came, causing

significant financial harm to Student Class Plaintiffs.

89.     Defendants have caused financial harm to Student Class Plaintiffs.

90.     Due to Defendant Union's breach of the contract and Defendants use of Student Class

Plaintiffs' funds to pay Defendant Union's other debts, Student Class Plaintiffs seek declaratory and

injunctive relief requiring Defendants to pay Student Class Plaintiffs back the money provided to them

since May of 2023.

## COUNT THREE: TORTIOUS INTERFERENCE WITH
## STUDENT CLASS PLAINTIFFS' CONTRACTS

91.     Student Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

92.     The contract Student Class Plaintiffs and Defendant Union entered into regarding education provided certain obligations each were required to perform. Defendants knew of the contracts between Student Class Plaintiffs and Defendant Union.

93.     On or about August 24, 2023, Defendant Union sent out an email indicating Fall One Semester was going to be delayed until September 11, 2023.

94.     On or about September 8, 2023, Student Class Plaintiffs were notified Fall One Semester classes were cancelled.

95.     Student Class Plaintiffs relied on this information provided by Defendant Union. Student Class Plaintiffs and many others had federal and/or private loans sent to Defendant Union. Many Student Class Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Student Class Plaintiffs relied on these statements by Defendant Union by continuing to wait for classes to begin and for their reimbursements to arrive. The payments by Student Class Plaintiffs to Defendant Union were misappropriated by Defendants to pay for other debts.

96.     Student Class Plaintiffs did not transfer to other schools. Student Class Plaintiffs were told classes were going to start on or about September 11, 2023. When Fall One Semester classes were cancelled, Defendant Union indicated Fall Two Semester classes were still going to take place. Once again, Student Class Plaintiffs did not transfer to other schools. Student Class Plaintiffs were told classes were going to take place.

97.     Plaintiffs' reliance on each of the statements by Defendant Union were soon discovered to be inaccurate, as Student Class Plaintiffs were notified on or about November 1, 2023, that Fall Two Semester classes were not going to take place.

98.    Defendants knew of the statements and did nothing to prevent the disclosure of inaccurate information.

99.    Defendants failed to exercise reasonable care owed to Student Class Plaintiffs in obtaining or communicating accurate information regarding classes. Defendant Union's statements demonstrated a conscious disregard for the rights of Student Class Plaintiffs and had a great probability of causing substantial harm to them.

100.    Student Class Plaintiffs have been substantially harmed by the misrepresentations made by Defendant Union in an ongoing nature as to when classes were going to begin and reimbursements were going to be paid.

101.    Student Class Plaintiffs have been substantially harmed. Student Class Plaintiffs' loan amounts have been added to their loan servicing agencies for classes that were not taught and reimbursements that were not provided. Defendant Union is liable for its misrepresentations.

102.    Student Class Plaintiffs are entitled to their actual damages for the negligent misrepresentation by Defendant Union. Defendant Union is liable for its tortious interference with Student Class Plaintiffs' contracts.

103.    Student Class Plaintiffs are entitled to punitive damages for the conscious disregard for the rights of Student Class Plaintiffs due to the misrepresentations by Defendant Union that led to substantial harm to Student Class Plaintiffs.

**COUNT FOUR: NEGLIGENT MISREPRESENTATION**

104.    Student Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

105.    Student Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Student Class Plaintiffs education at Defendant Union.

106.    Upon acceptance of the contracts by both Student Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

Case 1:25-bk-10562 Doc 28-2 #1 Filed 04/16/25 Entered 04/16/25 15:17:11 Desc
Exhibit B-Alon Operative Complaint    Page 20 of 61

Case 1:24-cv-00334-PLM Doc #: 1 Filed 06/20/24 Page 19 of 41 PAGEID #: 19

107.    Student Class Plaintiffs filled out the FAFSA to receive the benefit of an education
from Defendant Union through federal loans. Many Student Class Plaintiffs filled out applications for
private student loans. Many Student Class Plaintiffs qualified for grants from the federal government,
state governments and tribal lands. Each Student Class Plaintiff has fulfilled their obligations under
their respective contract requiring them to pay Defendant Union in exchange for receiving an
education.

108.    Under the terms of the contract between Student Class Plaintiffs and Defendants, any
funds received in excess of tuition is to be reimbursed to Student Class Plaintiffs to assist in paying
living expenses.

109.    On or about August 24, 2023, Defendant Union sent out an email indicating Fall One
Semester was going to be delayed until September 11, 2023.

110.    Student Class Plaintiffs relied on this information provided by Defendant Union.
Student Class Plaintiffs and many others had federal and/or private loans sent to Defendant Union.
The payments were misappropriated by Defendants to pay for Defendant Union's other debts.

111.    Student Class Plaintiffs relied on Defendant Union's statements by continuing to wait
for classes to begin and for their reimbursements to arrive. Student Class Plaintiffs did not transfer to
other schools. Student Class Plaintiffs were told classes were going to start on or about September 11,
2023. When Fall One Semester classes were cancelled on or about September 8, 2023, Defendant
Union sent an email indicating Fall Two Semester classes were still going to take place. Once again,
Student Class Plaintiffs did not transfer to other schools in reliance on promises that classes were
going to take place.

112.    Plaintiffs' reliance on the statements by Defendant Union were soon discovered to be
inaccurate, as Student Class Plaintiffs were notified on or about November 1, 2023, that Fall Two

Semester classes were cancelled. Defendants knew of the statements and did nothing to prevent the disclosure of inaccurate information.

113.    Defendants failed to exercise reasonable care owed to Student Class Plaintiffs in obtaining or communicating accurate information regarding classes beginning. Defendant Union's statements demonstrated a conscious disregard for the rights of Student Class Plaintiffs and had a great probability of causing substantial harm to them.

114.    Student Class Plaintiffs have been substantially harmed by the misrepresentations by Defendant Union in an ongoing nature as to when classes were going to begin and reimbursements paid.

115.    Student Class Plaintiffs have been substantially harmed. Student Class Plaintiffs' loan amounts have been added to their loan servicing agencies for classes that were not taught and reimbursements that were not provided for amounts in excess of tuition.

116.    Defendant Union is liable for its misrepresentations.

117.    Student Class Plaintiffs are entitled to their actual damages for the negligent misrepresentation by Defendant Union. Student Class Plaintiffs are entitled to punitive damages for the conscious disregard for the rights of Student Class Plaintiffs due to the misrepresentations by Defendant Union that led to substantial harm to Student Class Plaintiffs.

## COUNT FIVE: GROSS NEGLIGENT CONDUCT

118.    Student Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

119.    Student Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding Student Class Plaintiffs education at Defendant Union.

120.    Upon acceptance of the contracts by both Student Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

121.     Student Class Plaintiffs have fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education. Student Class Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendant Union through federal loans. Many Student Class Plaintiffs filled out applications for private student loans. Many Student Class Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Under the terms of the contract between Student Class Plaintiffs and Defendant Union, any funds received in excess of tuition is to be reimbursed to Student Class Plaintiffs to assist in paying living expenses.

122.     Since at least May of 2023, Defendant Union have failed to fulfill the contract requiring them to provide Student Class Plaintiffs with an education. Student Class Plaintiffs have not received any reimbursement from Defendant Union, or the reimbursement was late by several weeks.

123.     On or about August 24, 2023, Defendant Union sent an email to Student Class Plaintiffs indicating classes would not start until September 11, 2023. Subsequently, Defendant Union sent an email on or about September 8, 2023, indicating Fall One classes were cancelled and that Fall Two classes were still going to be taught.

124.     On or about November 1, 2023, Student Class Plaintiffs received an email indicating Fall Two classes were cancelled. Student Class Plaintiffs relied on Defendant Union's statements that Fall One and Fall Two classes were going to occur. Defendants knew Student Class Plaintiffs' reliance was going to occur based on their representations that classes would resume.

125.     Defendants knew of the statements and did nothing to prevent the disclosure of inaccurate information. Many Student Class Plaintiffs never received their reimbursement for student loans paid to Defendant Union in excess of tuition. Student Class Plaintiffs' funds were used by Defendants to pay Defendant Union's other debts.

126.    Student Class Plaintiffs have been unable to prove their student status with loan servicing agencies. Many Student Class Plaintiffs now have money added to their loans that paid for an education they never received and that include reimbursement amounts in excess of tuition that never came, causing significant financial harm to Student Class Plaintiffs.

127.    Defendants' actions constitute a reckless disregard for the rights of Student Class Plaintiffs. Defendants had knowledge of the great probability of harm that would occur from their gross negligence. Defendant Union is liable for the reckless disregard for the rights of Student Class Plaintiffs.

128.    Student Class Plaintiffs are entitled to their actual damages for the misrepresentations by Defendant Union. Student Class Plaintiffs are entitled to punitive damages for the conscious disregard for the rights of Student Class Plaintiffs due to the misrepresentations by Defendant Union that led to substantial harm to Student Class Plaintiffs.

## VI.    TEACH-OUT CLASS # 1 CLAIMS

### COUNT ONE: PROMISSORY ESTOPPEL

129.    Teach-out Class # 1 Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

130.    Teach-out Class # 1 Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Teach-out Class # 1 Plaintiffs education at Defendant Union.

131.    Upon acceptance of the contracts by both Teach-out Class # 1 Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

132.    Teach-out Class # 1 Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendants through federal loans. Many Teach-out Class # 1 Plaintiffs filled out applications for private student loans. Many Teach-out Class # 1 Plaintiffs qualified for grants from

the federal government, state governments and tribal lands. Each Teach-out Class # 1 Plaintiffs has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

133.    Since at least May of 2023, Defendant Union has failed to fulfill its obligations in the contracts requiring them to provide Teach-out Class # 1 Plaintiffs with an education.

134.    On or about August 24, 2023, Defendants sent emails to Teach-out Class # 1 Plaintiffs indicating classes would not start until September 11, 2023.

135.    On or about September 8, 2023, Fall One classes were cancelled and that Fall Two classes were still going to be taught.

136.    On or about November 1, 2023, Teach-out Class # 1 Plaintiffs received an email indicating Fall Two classes were cancelled.

137.    Teach-out Class # 1 Plaintiffs detrimentally relied on Defendants continued promises that Fall One and Fall Two classes were going to occur. Defendants knew Teach-out Class # 1 Plaintiffs' reliance was going to occur based on their representations that classes would resume.

138.    Defendants notified Teach-out Class # 1 Plaintiffs in December 2023 of teach-out opportunities. Defendant Union made certain promises that all the credits Teach-out Class # 1 Plaintiffs had taken at Defendant Union would be accepted by the schools.

139.    Teach-out Class # 1 Plaintiffs detrimentally relied on Defendant Union's promises that the teach-out universities were going to accept all the credits Teach-out Class # 1 Plaintiffs took at Defendant Union. Defendants knew Teach-out Class # 1 Plaintiffs' reliance was going to occur based on their representations by Defendants that the universities would accept all of the credits.

140.    Teach-out Class # 1 Plaintiffs soon discovered Defendant Union's promises were inaccurate as the teach-out universities notified Teach-out Class # 1 Plaintiffs that not all of the credits

would be accepted. Many Teach-out Class # 1 Plaintiffs are now required to retake classes and/or take additional coursework that would not have been required at Defendant Union.

141.    Teach-out Class # 1 Plaintiffs' reliance on Defendants inaccurate information has resulted in significant financial harm Teach-out Class # 1 Plaintiffs.

142.    Due to Defendant Union's breach of their contract, Teach-out Class # 1 Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to pay Teach-out Class # 1 Plaintiffs for the classes they have to retake and/or the additional classes they have to take that would not have been required to graduate from Defendant Union.

## COUNT TWO: NEGLIGENT MISREPRESENTATION

143.    Teach-out Class # 1 Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

144.    Teach-out Class # 1 Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Teach-out Class # 1 Plaintiffs education at Defendant Union.

145.    Upon acceptance of the contracts by both Teach-out Class # 1 Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

146.    Teach-out Class # 1 Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendants through federal loans. Many Teach-out Class # 1 Plaintiffs filled out applications for private student loans. Many Teach-out Class # 1 Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Each Teach-out Class # 1 Plaintiffs has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

147.    Since at least May of 2023, Defendant Union has failed to fulfill its obligations in the contract requiring them to provide Teach-out Class # 1 Plaintiffs with an education.

148.    On or about August 24, 2023, Defendant Union sent an email to Teach-out Class # 1 Plaintiffs indicating classes would not start until September 11, 2023. Teach-out Class # 1 Plaintiffs relied on this statement by not seeking an education elsewhere.

149.    On or about September 8, 2023, Defendant Union sent an email indicating Fall One classes were cancelled and that Fall Two classes were still going to be taught.

150.    Again Teach-out Class # 1 Plaintiffs relied on this representation by Defendant Union by not seeking an education elsewhere.

151.    On or about November 1, 2023, Teach-out Class # 1 Plaintiffs received an email indicating Fall Two classes were cancelled.

152.    Teach-out Class # 1 Plaintiffs detrimentally relied on Defendant Union's continued promises that Fall One and Fall Two classes were going to occur. Defendants knew Teach-out Class # 1 Plaintiffs' reliance was going to occur based on their representations that classes would resume.

153.    Defendant Union notified Teach-out Class # 1 Plaintiffs in December 2023 of teach-out opportunities. Defendant Union made certain promises that all the credits Teach-out Class # 1 Plaintiffs had taken at Defendant Union would be accepted by the schools.

154.    Teach-out Class # 1 Plaintiffs detrimentally relied on Defendant Union's promises that the teach-out universities were going to accept all the credits Teach-out Class # 1 Plaintiffs took at Defendant Union. Defendants knew Teach-out Class # 1 Plaintiffs' reliance was going to occur based on their representations by Defendant Union that the universities would accept all of Teach-out Class # 1 Plaintiffs' credits.

155.    Teach-out Class # 1 Plaintiffs soon discovered Defendant Union's promises were inaccurate as the teach-out universities notified Teach-out Class # 1 Plaintiffs that not all the credits would be accepted. Many Teach-out Class # 1 Plaintiffs are now required to retake classes and/or take additional coursework that would not have been required at Defendant Union.

156.    Teach-out Class # 1 Plaintiffs' reliance on Defendant Union's inaccurate information has resulted in significant financial harm.

157.    Defendants failed to exercise reasonable care owed to Teach-out Class # 1 Plaintiffs in obtaining or communicating accurate information regarding classes beginning. Defendant Union's statements demonstrated a conscious disregard for the rights of Teach-out Class # 1 Plaintiffs and had a great probability of causing substantial harm to them.

158.    Teach-out Class # 1 Plaintiffs have been substantially harmed by the misrepresentations made by Defendant Union that teach-out universities would accept all of Teach-out Class # 1 Plaintiffs credits. Teach-out Class # 1 Plaintiffs are now forced to retake classes and/or take additional classes to complete their degrees.

159.    Teach-out Class # 1 Plaintiffs have been substantially harmed. Teach-out Class # 1 Plaintiffs' loan amounts will have to be added to their loan servicing agencies for classes they already took and will have to take that would not have been required to graduate from Defendant Union.

160.    Defendant Union is liable for the misrepresentations made by them when relaying inaccurate information to Teach-out Class # 1 Plaintiffs.

161.    Teach-out Class # 1 Plaintiffs are entitled to their actual damages for the negligent misrepresentation by Defendant Union. Teach-out Class # 1 Plaintiffs are entitled to punitive damages for the conscious disregard for the rights of Teach-out Class # 1 Plaintiffs due to the misrepresentations by Defendant Union that led to substantial harm to Teach-out Class # 1 Plaintiffs.

## COUNT THREE: GROSS NEGLIGENT CONDUCT

162.    Teach-out Class # 1 Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

163.    Teach-out Class # 1 Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Teach-out Class # 1 Plaintiffs education at Defendant Union.

164.    Upon acceptance of the contracts by both Teach-out Class # 1 Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

165.    Teach-out Class # 1 Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendants through federal loans. Many Teach-out Class # 1 Plaintiffs filled out applications for private student loans. Many Teach-out Class # 1 Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Each Teach-out Class # 1 Plaintiffs has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

166.    Since at least May of 2023, Defendant Union has failed to fulfill its obligations in the contract requiring them to provide Teach-out Class # 1 Plaintiffs with an education.

167.    On or about August 24, 2023, Defendant Union sent an email to Teach-out Class # 1 Plaintiffs indicating classes would not start until September 11, 2023.

168.    On or about September 8, 2023, Defendant Union sent an email indicating Fall One classes were cancelled and that Fall Two classes were still going to be taught.

169.    Again Teach-out Class # 1 Plaintiffs relied on this representation by Defendant Union by not seeking an education elsewhere.

170.    On or about November 1, 2023, Teach-out Class # 1 Plaintiffs received an email indicating that Fall Two classes were cancelled.

171.    Teach-out Class # 1 Plaintiffs detrimentally relied on Defendant Union's continued promises that Fall One and Fall Two classes were going to occur. Defendants knew Teach-out Class # 1 Plaintiffs' reliance was going to occur based on their representations that classes would resume.

172.    Defendant Union notified Teach-out Class # 1 Plaintiffs in December 2023 of teach-out opportunities. Defendant Union made certain promises that all the credits Teach-out Class # 1 Plaintiffs had taken at Defendant Union would be accepted by the schools.

173.    Teach-out Class # 1 Plaintiffs detrimentally relied on Defendant Union's promises that the teach-out universities were going to accept all the credits Teach-out Class # 1 Plaintiffs took at Defendant Union. Defendants knew that Teach-out Class # 1 Plaintiffs' reliance was going to occur based on their representations by Defendant Union that the universities would accept all the credits.

174.    Teach-out Class # 1 Plaintiffs soon discovered Defendant Union's promises were inaccurate as the teach-out universities notified Teach-out Class # 1 Plaintiffs that not all the credits would be accepted. Many Teach-out Class # 1 Plaintiffs are now required to retake classes and/or take additional coursework that would not have been required at Defendant Union.

175.    Teach-out Class # 1 Plaintiffs' reliance on Defendant Union's inaccurate information has resulted in significant financial harm.

176.    Defendants failed to exercise reasonable care owed to Teach-out Class # 1 Plaintiffs in obtaining or communicating accurate information regarding classes beginning. Defendant Union's statements demonstrated a conscious disregard for the rights of Teach-out Class # 1 Plaintiffs and had a great probability of causing substantial harm to them.

177.    Teach-out Class # 1 Plaintiffs have been substantially harmed by the misrepresentations made by Defendant Union that teach-out universities would accept all of Teach-out Class # 1 Plaintiffs credits. Teach-out Class # 1 Plaintiffs are now forced to retake classes and/or take additional classes in order to complete their degrees.

178.    Teach-out Class # 1 Plaintiffs have been substantially harmed. Teach-out Class # 1 Plaintiffs' loan amounts will have to be added to their loan servicing agencies for classes they already took and will have to take that would not have been required to graduate from Defendant Union.

179.    Defendant Union is liable for its misrepresentations made when relaying inaccurate information to Teach-out Class # 1 Plaintiffs.

180.    Defendant Union's actions constitute a reckless disregard for the rights of Teach-out Class # 1 Plaintiffs. Defendant Union had knowledge of the great probability of harm that would occur from their gross negligence.

181.    Teach-out Class # 1 Plaintiffs are entitled to their actual damages for the misrepresentations by Defendant Union. Teach-out Class # 1 Plaintiffs are entitled to punitive damages for the conscious disregard for the rights of Teach-out Class # 1 Plaintiffs due to the misrepresentations by Defendant Union that led to substantial harm to Teach-out Class # 1 Plaintiffs.

## VII.    TEACHOUT CLASS # 2

## COUNT ONE: PROMISSORY ESTOPPEL

182.    Teach-out Class # 2 Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

183.    Teach-out Class # 2 Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Teach-out Class # 2 Plaintiffs education at Defendant Union.

184.    Upon acceptance of the contracts by both Teach-out Class # 2 Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

185.    Teach-out Class # 2 Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendants through federal loans. Many Teach-out Class # 2 Plaintiffs filled out applications for private student loans. Many Teach-out Class # 2 Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Each Teach-out Class # 2 Plaintiffs has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

186.     Since at least May of 2023, Defendant Union has failed to fulfill its obligations in the contract requiring them to provide Teach-out Class # 2 Plaintiffs with an education.

187.     On or about August 24, 2023, Defendant Union sent an email to Teach-out Class # 2 Plaintiffs indicating classes would not start until September 11, 2023.

188.     On or about September 8, 2023, Defendant Union indicated Fall One classes were cancelled and that Fall Two classes were still going to be taught.

189.     On or about November 1, 2023, Teach-out Class # 2 Plaintiffs received an email indicating Two classes were cancelled.

190.     Teach-out Class # 2 Plaintiffs detrimentally relied on Defendant Union's continued promises that Fall One and Fall Two classes were going to occur. Defendants knew Teach-out Class # 2 Plaintiffs' reliance was going to occur based on their representations that classes would resume.

191.     Defendant Union notified Teach-out Class # 2 Plaintiffs in December 2023 of teach-out opportunities. Teach-out Class # 2 Plaintiffs detrimentally relied on Defendant Union's promises that the teach-out universities were going to assist them in completing their degrees. Defendants knew Teach-out Class # 2 Plaintiffs' reliance was going to occur based on their representations.

192.     Teach-out Class # 2 Plaintiffs soon discovered Defendant Union's promises were inaccurate as the teach-out universities notified Teach-out Class # 2 Plaintiffs that they did not qualify for financial aid. Many Teach-out Class # 2 Plaintiffs are now left with having to pay for a semester out of pocket or seek private loans at a high interest rate.

193.     Teach-out Class # 2 Plaintiffs' reliance on Defendant Union inaccurate information has resulted in significant financial harm.

194.     Due to Defendant Union breach of their contract , Teach-out Class # 2 Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to pay Teach-out Class # 2 Plaintiffs for the loans in excess of the financial aid they would have received at Defendant Union.

## COUNT TWO: NEGLIGENT MISREPRESENTATION

195.    Teach-out Class # 2 Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

196.    Teach-out Class # 2 Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Teach-out Class # 2 Plaintiffs education at Defendant Union.

197.    Upon acceptance of the contracts by both Teach-out Class # 2 Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

198.    Teach-out Class # 2 Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendants through federal loans. Many Teach-out Class # 2 Plaintiffs filled out applications for private student loans. Many Teach-out Class # 2 Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Each Teach-out Class # 2 Plaintiffs has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

199.    Since at least May of 2023, Defendant Union has failed to fulfill its obligations in the contract requiring them to provide Teach-out Class # 2 Plaintiffs with an education.

200.    On or about August 24, 2023, Defendant Union sent an email to Teach-out Class # 2 Plaintiffs indicating classes would not start until September 11, 2023.

201.    On or about September 8, 2023, Defendant Union indicated Fall One classes were cancelled and that Fall Two classes were still going to be taught.

202.    On or about November 1, 2023, Teach-out Class # 2 Plaintiffs received an email indicating Fall Two classes were cancelled.

203.    Teach-out Class # 2 Plaintiffs detrimentally relied on Defendant Union's continued promises that Fall One and Fall Two classes were going to occur. Defendants knew Teach-out Class # 2 Plaintiffs' reliance was going to occur based on their representations that classes would resume.

204.    Defendant Union notified Teach-out Class # 2 Plaintiffs in December 2023 of teach-out opportunities. Teach-out Class # 2 Plaintiffs detrimentally relied on Defendant Union's promises that the teach-out universities were going to assist them in completing their degrees. Defendants knew Teach-out Class # 2 Plaintiffs' reliance was going to occur based on their representations.

205.    Teach-out Class # 2 Plaintiffs soon discovered Defendant Union's promises were inaccurate as the teach-out universities notified Teach-out Class # 2 Plaintiffs that they did not qualify for financial aid. Many Teach-out Class # 2 Plaintiffs are now left with having to pay for a semester out of pocket or seek private loans at a high interest rate.

206.    Teach-out Class # 2 Plaintiffs' reliance on Defendant Union's inaccurate information has resulted in significant financial harm.

207.    Defendants failed to exercise reasonable care owed to Teach-out Class # 2 Plaintiffs in obtaining or communicating accurate information regarding the adequacy of the teach-out programs. Defendant Union's statements demonstrated a conscious disregard for the rights of Teach-out Class # 2 Plaintiffs and had a great probability of causing substantial harm to them.

208.    Teach-out Class # 2 Plaintiffs have been substantially harmed. Teach-out Class # 2 Plaintiffs' loan amounts will have to be added to their loan servicing agencies that would not have been required to graduate from Defendant Union.

209.    Defendant Union is liable for its misrepresentations made when relaying inaccurate information to Teach-out Class # 2 Plaintiffs.

210.    Teach-out Class # 2 Plaintiffs are entitled to their actual damages for the negligent misrepresentation by Defendant Union. Teach-out Class # 2 Plaintiffs are entitled to punitive damages

for the conscious disregard for the rights of Teach-out Class # 2 Plaintiffs due to the misrepresentations by Defendant Union that led to substantial harm to Teach-out Class # 2 Plaintiffs.

## COUNT THREE: GROSS NEGLIGENT CONDUCT

211.    Teach-out Class # 2 Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

212.    Teach-out Class # 2 Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Teach-out Class # 2 Plaintiffs education at Defendant Union.

213.    Upon acceptance of the contracts by both Teach-out Class # 2 Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

214.    Teach-out Class # 2 Plaintiffs filled out the FAFSA to receive the benefit of an education from Defendants through federal loans. Many Teach-out Class # 2 Plaintiffs filled out applications for private student loans. Many Teach-out Class # 2 Plaintiffs qualified for grants from the federal government, state governments and tribal lands. Each Teach-out Class # 2 Plaintiffs has fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

215.    Since at least May of 2023, Defendant Union has failed to fulfill its obligations in the contract requiring them to provide Teach-out Class # 2 Plaintiffs with an education.

216.    On or about August 24, 2023, Defendant Union sent an email to Teach-out Class # 2 Plaintiffs indicating classes would not start until September 11, 2023.

217.    On or about September 8, 2023, Defendant Union indicated Fall One classes were cancelled and that Fall Two classes were still going to be taught.

218.    On or about November 1, 2023, Teach-out Class # 2 Plaintiffs received an email indicating Fall Two classes were cancelled.

219.    Teach-out Class # 2 Plaintiffs detrimentally relied on Defendant Union continued promises that Fall One and Fall Two classes were going to occur. Defendants knew Teach-out Class # 2 Plaintiffs' reliance was going to occur based on their representations that classes would resume.

220.    Defendant Union notified Teach-out Class # 2 Plaintiffs in December 2023 of teach-out opportunities. Teach-out Class # 2 Plaintiffs detrimentally relied on Defendant Union's promises that the teach-out universities were going to assist them in completing their degrees. Defendants knew Teach-out Class # 2 Plaintiffs' reliance was going to occur based on their representations by Defendant Union.

221.    Teach-out Class # 2 Plaintiffs soon discovered Defendant Union's promises were inaccurate as the teach-out universities notified Teach-out Class # 2 Plaintiffs that they did not qualify for financial aid. Many Teach-out Class # 2 Plaintiffs are now left with having to pay for a semester out of pocket or seek private loans at a high interest rate.

222.    Teach-out Class # 2 Plaintiffs' reliance on Defendant Union's inaccurate information has resulted in significant financial harm.

223.    Defendants failed to exercise reasonable care owed to Teach-out Class # 2 Plaintiffs in obtaining or communicating accurate information regarding the adequacy of the teach-out programs. Defendant Union's statements demonstrated a conscious disregard for the rights of Teach-out Class # 2 Plaintiffs and had a great probability of causing substantial harm to them.

224.    Teach-out Class # 2 Plaintiffs have been substantially harmed by the misrepresentations made by Defendant Union that teach-out universities would give them the ability to finish their degrees. Teach-out Class # 2 Plaintiffs are now forced to pay out of pocket or apply for private loans in excess of the financial aid they would have received at Defendant Union to complete their degrees.

225.    Teach-out Class # 2 Plaintiffs have been substantially harmed. Teach-out Class # 2
Plaintiffs' loan amounts will have to be added to their loan servicing agencies in excess of the amount
of financial aid they would have received from Defendant Union.

226.    Defendant Union is liable for its misrepresentations made when relaying inaccurate
information to Teach-out Class # 2 Plaintiffs.

227.    Defendant Union's actions constitute a reckless disregard for the rights of Teach-out
Class # 2 Plaintiffs. Defendants had knowledge of the great probability of harm that would occur
from their gross negligence.

228.    Teach-out Class # 2 Plaintiffs are entitled to their actual damages for the
misrepresentations by Defendant Union. Teach-out Class # 2 Plaintiffs are entitled to punitive
damages for the conscious disregard for the rights of Teach-out Class # 2 Plaintiffs due to the
misrepresentations by Defendant Union that led to substantial harm to Teach-out Class # 2 Plaintiffs.

## VIII.   DIPLOMA CLASS

### COUNT ONE: BREACH OF CONTRACT

229.    Diploma Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

230.    Diploma Class Plaintiffs entered into verbal and/or written contracts with Defendant
Union regarding the Diploma Class Plaintiffs education at Defendant Union.

231.    Upon acceptance of the contracts by both Diploma Class Plaintiffs and Defendant
Union, each had obligations to perform for the benefit of the other regarding a college education.

232.    Diploma Class Plaintiffs have fulfilled their obligations under their respective contract
requiring them to pay Defendant Union in exchange for receiving an education.

233.    Diploma Class Plaintiffs completed their degrees at Defendant Union. Defendant
Union has failed to fulfill their contractual obligations by providing Diploma Class Plaintiffs with their
diploma upon graduation.

234.    Since Defendant Union has breached its contract with Diploma Class Plaintiffs, Diploma Class Plaintiffs have suffered damages.

235.    Due to Defendant Union's breach of its contract, Diploma Class Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to provide Diploma Plaintiffs with their diploma.

## COUNT TWO: PROMISSORY ESTOPPEL

236.    Diploma Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

237.    Diploma Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Diploma Class Plaintiffs education at Defendant Union.

238.    Upon acceptance of the contracts by both Diploma Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

239.    Diploma Class relied upon the promise of receiving a diploma upon graduation under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

240.    Diploma Class Plaintiffs completed their degrees at Defendant Union. Defendant Union has failed to fulfill their contractual obligations by providing Diploma Class Plaintiffs with their diploma upon graduation.

241.    Since Defendant Union has breached its contract with Diploma Class Plaintiffs, Diploma Class Plaintiffs have suffered damages.

242.    Due to Defendant Union's breach of their contract, Diploma Class Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to provide Diploma Class Plaintiffs with their diploma.

## COUNT THREE: NEGLIGENCE

243.    Diploma Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

244.    Diploma Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Diploma Class Plaintiffs education at Defendant Union.

245.    Upon acceptance of the contracts by both Diploma Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

246.    Diploma Class relied upon the promise of receiving a diploma upon graduation under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

247.    Diploma Class Plaintiffs completed their degrees at Defendant Union. Defendant Union has failed to fulfill their contractual obligations by providing Diploma Class Plaintiffs with their diploma upon graduation.

248.    Defendant Union owed Diploma Class Plaintiffs a duty to provide them with their diploma upon graduation. Defendant Union has breached that duty by not providing Diploma Class Plaintiffs with their diploma upon graduation.

249.    As a result of Defendant Union's breach, Diploma Class Plaintiffs have suffered an injury. Defendants were the cause of that injury.

250.    Diploma Class Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to provide Diploma Class Plaintiffs with their diploma.

## IX.    TRANSCRIPT CLASS

## COUNT ONE: BREACH OF CONTRACT

251.    Transcript Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

252.    Transcript Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Transcript Class Plaintiffs education at Defendant Union.

253.    Upon acceptance of the contracts by both Transcript Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

254.    Transcript Class Plaintiffs have fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

255.    Transcript Class Plaintiffs paid for Defendant Union to provide them with transcripts so they could apply to other universities and/or graduate programs. Defendant Union has failed to fulfill their contractual obligations by providing Transcript Class Plaintiffs with their transcripts.

256.    Since Defendant Union has breached its contract with Transcript Class Plaintiffs, Transcript Class Plaintiffs have suffered damages.

257.    Due to Defendant Union's breach of their contract, Transcript Class Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to provide Transcript Class Plaintiffs with their transcripts.

### COUNT TWO: PROMISSORY ESTOPPEL

258.    Transcript Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

259.    Transcript Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Transcript Class Plaintiffs education at Defendant Union.

260.    Upon acceptance of the contracts by both Transcript Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

261.    Transcript Class Plaintiffs have fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

262.    Transcript Class Plaintiffs paid for Defendant Union to provide them with transcripts so they could apply to other universities and/or graduate programs.

263.    Transcript Class Plaintiffs relied upon the promise that paying for a transcript, one would be provided to them by Defendant Union. Defendant Union has failed to fulfill their contractual obligations by providing Transcript Class Plaintiffs with their transcripts.

264.    Since Defendant Union has breached their contract with Transcript Class Plaintiffs, Transcript Class Plaintiffs have suffered damages.

265.    Due to Defendant Union's breach of their contract, Transcript Class Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to provide Transcript Class Plaintiffs with their transcripts.

### COUNT THREE: NEGLIGENCE

266.    Transcript Class Plaintiffs incorporate paragraphs 1 through 68 by reference herein.

267.    Transcript Class Plaintiffs entered into verbal and/or written contracts with Defendant Union regarding the Transcript Class Plaintiffs education at Defendant Union.

268.    Upon acceptance of the contracts by both Transcript Class Plaintiffs and Defendant Union, each had obligations to perform for the benefit of the other regarding a college education.

269.    Transcript Class Plaintiffs have fulfilled their obligations under their respective contract requiring them to pay Defendant Union in exchange for receiving an education.

270.    Transcript Class Plaintiffs paid for Defendant Union to provide them with transcripts so they could apply to other universities and/or graduate programs. Defendant Union has failed to fulfill their contractual obligations by providing Transcript Class Plaintiffs with their transcripts.

271.    Defendant Union had a duty to provide Transcript Class Plaintiffs with their transcripts upon receiving payment. Defendant Union has breached that duty by failing to provide transcripts to Transcript Class Plaintiffs.

272.    As a result of Defendant Union's breach, Transcript Class Plaintiffs have suffered injury. Defendant Union was the cause of that injury.

273.    Transcript Class Plaintiffs seek declaratory and injunctive relief requiring Defendant Union to provide Transcript Class Plaintiffs with their transcripts.

### X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court will enter judgment against Defendants and grant the following relief:

274.    Grant Class Certification;

275.    Declaratory and injunctive relief;

276.    Equitable relief (where applicable);

277.    Compensatory Damages (where applicable);

278.    Punitive Damages (where applicable);

279.    Pre and post-judgment interest;

280.    Reasonable attorney fees and costs (where applicable);

281.    Leave to add additional Plaintiffs and/or state law claims by motion, the filing of written consent forms, or any other method approved by the Court; and

282.    For such other and further relief, in law or equity, as this Court may deem appropriate and just.

## XI.    JURY DEMAND

Plaintiffs, by counsel, hereby request that trial of this matter be tried by a jury.

Respectfully submitted,

*/s/Robert E. DeRose*
Robert E. DeRose (OH Bar No. 0055214)
**BARKAN MEIZLISH DEROSE COX, LLP**
4200 Regent Street, Suite 210
Columbus, OH 43219
(P) 614-221-4221
(F) 614-744-2300
(E) bderose@barkanmeizlish.com

*/s/ Rachel J. Guin*
Rachel J. Guin (*Pro Hac Vice Anticipated*)
Michelle K. Floyd (*Pro Hac Vice Anticipated*)
**ROTHBERG LAW FIRM**
505 E. Washington Blvd.
Fort Wayne, IN 46859
(P) (260) 422-9454
(F) (260) 422-1622
(E) rguin@rothberg.com
      mfloyd@rothberg.com

Case: 1:24-cv-00334-JPH Doc #: 1-1 Filed: 06/20/24 Page: 1 of 25 PAGEID #: 42

# Exhibit A

Case 1:25-bk-10562 Doc 28-2 Filed 04/16/25 Entered 04/16/25 15:17:11 Desc
Exhibit B-Alon Operative Complaint Page 44 of 61

Case 1:24-cv-00334-JPH Doc #: 1-1 Filed 06/20/24 Page: 26 of 25 PAGEID #: 43



230 South LaSalle Street, Suite 7-500
Chicago, IL 60604
312.263.0456 | 800.621.7440
Fax: 312.263.7462 | hlcommission.org

**Public Disclosure**
**Union Institute & University**
**Designation: Financial Distress**
**Effective: September 7, 2023**

The Higher Learning Commission (HLC) has assigned a Financial Distress designation to Union Institute & University in Cincinnati, Ohio, based on the institution being placed on Heightened Cash Monitoring 2 (HCM2) by the U.S. Department of Education and related information.

A Financial Distress designation is a consumer protection mechanism meant to apprise the public that current conditions at an accredited college or university raise serious concerns about its resource base to support its educational programs per HLC's Criteria for Accreditation, Core Component 5.B. HLC does not undertake any independent evaluation of the institution in advance of assigning a designation.

Union Institute & University remains accredited while assigned the Financial Distress designation.

**What the Financial Distress Designation Means for Students**

In most cases, colleges and universities will continue to accept Union Institute & University's credits for transfer and admission to other higher degree programs and institutions. As all colleges and universities define their own transfer credit and admission policies, students interested in other institutions are advised to seek information on individual transfer and admission policies.

**Next Steps**

The institution will host a Focused Visit in October 2023 on its compliance with certain HLC requirements, including Core Component 5.B. HLC anticipates the designation will remain in place until the Focused Visit process concludes. Once final action is taken on the Focused Visit by an appropriate decision-making body, HLC will determine whether the designation can be removed or if other action is necessary.

**About the Higher Learning Commission**

*The Higher Learning Commission accredits approximately 1,000 colleges and universities throughout the United States. HLC is a private, nonprofit accrediting agency that is recognized by the U.S. Department of Education and the Council for Higher Education Accreditation. Questions? Contact info@hlcommission.org or call 312.263.0456.*

Date of Posting: September 8, 2023

Case: 1:24-cv-00334-JPH Doc #: 1-2 Filed: 06/20/24 Page: 1 of 25 PAGEID #: 44

# Exhibit B



230 South LaSalle Street, Suite 7-500
Chicago, IL 60604-1411
312.263.0456 | 800.621.7440
Fax: 312.263.7462 | hlcommission.org

May 5, 2017

Dr. Roger Sublett
President
Union Institute & University
440 E. McMillan Street
Cincinnati, OH 45206

Dear President Sublett:

This letter serves as formal notification and official record of action taken concerning Union Institute & University by the Institutional Actions Council of the Higher Learning Commission at its meeting on May 1, 2017. The date of this action constitutes the effective date of the institution's new status with HLC.

**Action with Interim Monitoring.** IAC continued the accreditation of Union Institute & University with the next Reaffirmation of Accreditation in 2026-27. In conjunction with this action, IAC required the following interim monitoring.

**Interim Report.** An Interim Report due 6/1/2018 on faculty evaluation (3.C), evaluation of graduate success (4.A) to include the Federal Compliance area of Student Outcomes Data, and on institutional goals for retention, persistence and completion (4.C).

Further, IAC voted to change the team's evaluation of Criterion 4C from "Met" to "Met with Concerns" with the following evidence and determined a monitoring report should be submitted.

**Rationale:** IAC added the interim report on institutional goals for retention, persistence, and completion and changing 4C to met with concerns because: Core Component 4C identified institutions must have defined goals for persistence, retention, and completion and therefore these items must be provided by the institution.

In two weeks, this action will be added to the *Institutional Status and Requirements (ISR) Report*, a resource for Accreditation Liaison Officers to review and manage information regarding the institution's accreditation relationship. Accreditation Liaison Officers may request the ISR Report on HLC's website at http://www.hlcommission.org/isr-request.

Information on notifying the public of this action is available at http://www.hlcommission.org/HLC-Institutions/institutional-reporting-of-actions.html.

If you have any questions about these documents after viewing them, please contact the institution's staff liaison Eric Martin. Your cooperation in this matter is appreciated.

Sincerely,

*Barbara Gellman-Danley*

Barbara Gellman-Danley
President

CC: ALO

Case 1:24-cv-00034-J   Doc #: 1-3   Filed 08/29/24   Page 1 of 16   PageID #: 46

# Exhibit C



**NOV 0 7 2023**

Dr. Karen Schuster Webb
President
Union Institute and University
2090 Florence Avenue
Cincinnati, Ohio 45206-1925

SENT VIA UPS OVERNIGHT MAIL
Tracking #1Z37X7Y30197202432

OPE ID:  01092300

Re:  Imposition of Emergency Action and Initiation of Termination and Fine Actions

Dear Dr. Webb:

This is to inform you that the United States Department of Education ("Department") is hereby
imposing an emergency action and initiating a termination action and a fine action against Union
Institute & University ("UIU"), located in Cincinnati, Ohio.  The Department is taking the
emergency action under the authority of 20 U.S.C. § 1094(c)(1)(G), and the procedures set forth
in the Student Assistance General Provisions regulations at 34 C.F.R. § 668.83.  The basis for the
emergency action is identified in Part I of this letter.  As explained in Part II of this letter, for
these same reasons, the Department intends to terminate the eligibility of UIU to participate in
programs authorized under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C.
§ 1070 et seq. ("Title IV programs") and the procedures set forth in 34 C.F.R. §§ 668.86, 668.95,
and 668.97.  Finally, for the reasons set forth in Part III of this letter, the Department intends to
fine UIU $4,262,720 for violations described herein.

I.

Under this emergency action, the Department withholds funds from UIU and its students and
withdraws UIU's authority to obligate and disburse funds under the following Title IV programs:
Federal Pell Grant (Pell Grant"), Federal Supplemental Educational Opportunity Grant
("FSEOG"), Iraq and Afghanistan Service Grant ("IASG"), Teacher Education Assistance for
College and Higher Education ("TEACH") Grant, Federal Work-Study ("FWS"), Federal
Perkins Loan ("Perkins"), and William D. Ford Federal Direct Loan ("Direct Loan").  The Direct
Loan Program includes the Federal Direct Stafford/Ford Loan Program, the Federal Direct
Unsubsidized Stafford/Ford Loan Program, and the Federal Direct PLUS Program.  The FSEOG,
FWS, and Perkins Loan programs are known as the campus-based programs.

While the emergency action is in effect, UIU is barred from initiating commitments of Title IV
Program aid to students, whether by accepting Student Aid Reports under the Pell Grant Program
or the TEACH Grant Program, by certifying applications for loans under the Direct Loan
Program or issuing a commitment for aid under the campus-based programs.  UIU is also barred



Union Institute and University
Page 2

from using its own funds or Federal funds on hand to make Title IV program grants, loans, or work assistance payments to students, or to credit student accounts with respect to such assistance. Further, UIU may not release to students Direct Loan proceeds and must return any loan proceeds to the lender. Finally, unless other arrangements are agreed to between UIU and the Department, UIU may not disburse or obligate any additional Title IV program funds to satisfy commitments in accordance with 34 C.F.R. § 668.26 for as long as the emergency action remains in effect.

In order to take an emergency action against an institution, a designated Department official must determine that immediate action is necessary to prevent the continued misuse of Federal funds, and that the likelihood of loss outweighs the importance of awaiting the outcome of the regulatory procedures prescribed for limitation, suspension, or termination actions. As the designated Department official, based on the violations described below, I have determined that immediate action is necessary to prevent misuse of Federal funds, and that the likelihood of loss outweighs the importance of these regulatory procedures for limitation, suspension, or termination.

The Department has based this decision upon reliable information obtained as a result of inquiries made by the Department's Chicago/Denver School Participation Division ("SPD"). As part of its inquiries, the Department analyzed documentation submitted by UIU in response to two separate file review requests for unpaid credit balances, information provided in complaints from students and employees, information provided by Departmental records, and information provided by UIU itself and from staff research. This information disclosed that UIU committed severe breaches of its fiduciary duty to its students and the Department as well as committed serious, ongoing violations of Title IV regulations. Based on the violations outlined below, the Department has determined that an emergency action against UIU is warranted.

## I. UIU BREACHED ITS FIDUCIARY DUTY TO ITS STUDENTS AND THE DEPARTMENT

Before UIU began participation in the Title IV programs, you signed a program participation agreement ("PPA") with the Department stating that UIU would comply with all Title IV program requirements. (Enclosure 1). These requirements mandate that UIU use funds received under Title IV solely for the purposes specified in each individual student assistance program, since the funds received under those programs are held in trust for the intended student beneficiary and the Secretary. 20 U.S.C. § 1094(a)(1); see generally 34 C.F.R. § 668.14. By entering into a PPA with the Department, UIU, and its officers, accepted the responsibility to act as fiduciaries in the administration of the Title IV programs. As fiduciaries, the institution and officers are subject to the highest standard of care and diligence in administering the Title IV programs and in accounting to the Secretary for the funds received. 34 C.F.R. § 668.82(a) and (b).

In order to meet its responsibilities to the Department, an institution must be capable of adequately administering the Title IV programs. In this regard, an institution must comply with all Title IV statutory and regulatory requirements. 34 C.F.R. § 668.16(a). In addition, an institution must meet the Title IV financial responsibility standards. See 34 C.F.R. Part 668, Subpart L. Compliance with these standards is critical to ensure that an institution has sufficient

Dr. Karen Schuster
Union Institute and University
Page 3

resources to effectively meet the needs of students and the Title IV programs. An institution must also administer the Title IV programs in which it participates with adequate checks and balances in its system of internal controls. 34 C.F.R. § 668.16(c)(1). This includes maintaining accurate and complete records supporting all Title IV payments made to each student. See 34 C.F.R. §§ 668.16(d), 668.24.

As set forth below, UIU has breached its fiduciary duty to its students and the Department. In July 2023, the SPD received allegations from students and employees[1] that UIU was not meeting its ongoing financial obligations and was not acting as a fiduciary with its administration of Title IV program funds. Specifically, UIU was alleged to have not been paying Title IV credit balances to students, not paying the salaries of its employees, and of being in arrears on its debts. After the SPD obtained information from UIU that the student complaints concerning unpaid credit balances were correct, the SPD transferred UIU to the Heightened Cash Monitoring 2 ("HCM2") method of payment on August 9, 2023. UIU subsequently ceased offering instruction, as of August 28, 2023, for all of its on-ground programs when it cancelled the start of its Fall 1 term scheduled to begin on that date. Even though UIU ceased offering its on-ground programs, it asserted in response to the SPD's inquiries, that it had not ceased instruction because it was continuing to offer online instruction, despite its apparent inability to meet its payroll obligations and the resulting loss of staff. The SPD has not confirmed whether any online students are able to engage with UIU faculty although the other conditions described in this letter support the emergency action.

## A. Union Hypothecated Title IV Credit Balances Owed to Students

If an institution disburses Title IV program funds by crediting a student's account and the total amount of all Title IV program funds credited exceeds that amount of tuition and fees, room and board, and other authorized charges the student is required to pay, the institution must pay the resulting credit balance directly to the student or parent. These credit balances must be paid as soon as possible but no later than 14 days after the balance occurred, or 14 days after the first day of classes in a payment period if the balance occurred before that time. 34 C.F.R. § 668.164(h). Credit balances must be paid promptly because those funds may be needed to cover living expenses or other non-institutional costs. Institutions may in general hold credit balance funds to cover future payment period charges only if a valid authorization is obtained from the student (or parent). 34 C.F.R. § 668.165(b). However, even if an institution obtains a valid authorization, it must pay any remaining balance on loan funds by the end of the loan period and any remaining other Title IV funds by the end of the last payment period in the award year for which the funds were awarded. 34 C.F.R. § 668.165(b)(5)(iii).

In April 2023, student and employee complaints alerted the SPD to allegations that UIU had failed to pay Title IV credit balances for its Spring 2023 term. The SPD reviewed the complaints and emailed UIU officials on April 21, 2023, requesting an informal file review of all Title IV credit balances that were due to be paid for the Spring 2023 term. According to the file review data submitted by UIU on May 3, 2023, the majority of unpaid Title IV credit balances had been

---

[1] Employees complained to the Ohio Department of Higher Education (ODHE) and ODHE shared the information with the SPD.

Dr. Karen Schuster
Union Institute and University
Page 4

paid by the institution on April 14, 2023.[2] (Enclosure 2).  Given UIU's response to these
complaints, and completion of the requested file review, institutional officials were fully aware
of UIU's obligation to timely pay Title IV credit balances.

UIU again drew down student funds from the Department and misappropriated the Title IV
proceeds to pay other expenses in June 2023.  At the end of July 2023, the SPD received
additional student complaints regarding UIU's continued failure to pay Title IV credit balances.
In response to these complaints, the SPD again contacted UIU and spoke with UIU's Interim
Vice President of Academic Affairs, Dr. Tom Frederick on July 31, 2023.  During this
conversation, Dr. Frederick noted that UIU was having "cash flow issues again."  He also
explained that UIU had issued all Title IV credit balances to those students who had set up direct
deposit/electronic funds transfers but that it was not issuing/mailing paper Title IV credit balance
checks because they would not be honored if students attempted to cash them.

Dr. Frederick also informed the SPD that UIU's Chief Fiscal Officer and most of the Business
Office had resigned and that several other staff had been "let go".  Given these circumstances,
the SPD requested that UIU submit another file review for all Title IV credit balances owed by
UIU from May 2023 to early August 2023.  The completed spreadsheet submitted by UIU on
August 8, 2023, identified a total of $753,374 in outstanding Title IV credit balances that were
owed to 157 students. (Enclosure 3).  Alarmingly, most of the Title IV credit balances reported
as late on the August 8th accounting were due to be paid in mid-May, barely one month after UIU
had resolved the first instance of non-compliance.  As a result of UIU's continued failure to pay
Title IV credit balances, the Department transferred UIU to the "HCM2" system of payment on
August 9, 2023.  Furthermore, the Department's August 9, 2023 HCM2 notification stipulated
that prior to submitting its first HCM2 claim, UIU was required to document that outstanding
credit balances have been paid and the checks liquidated. (Enclosure 4).

In an attempt to explain the unpaid Title IV credit balances, you asserted in a response sent via
email on August 28, 2023, that the Title IV credit balance funds were in one of UIU's bank
accounts.  You went on to explain that UIU couldn't access the account to pay the Title IV credit
balances owed because a third party had placed a lien on the account and the bank subsequently
swept the account and used those funds to pay the balances owed on UIU's delinquent credit
cards. (Enclosure 5).  If this is true, it is an egregious failure to protect UIU students Title IV
funds.  The regulations set forth under 34 C.F.R § 668.163 require institutions to ensure that
accounts containing Title IV funds are clearly identified as such by either including the phrase
"Federal Funds" in the name of the account, notifying the bank which accounts contain Title IV
funds, or filing a UCC-1 statement disclosing that the account contains Federal funds.
Complying with this mandate would have prevented other entities from obtaining Title IV funds
that belonged to students.  Notably, you also informed the Department that you contacted the
bank to protest the use of designated funds after the bank had already swept the account.
However, notifying the bank after the fact does nothing to cure UIU's critical failure as a
fiduciary.

---

[2] Of the 390 students with Title IV credit balances due, 50 (12.8%) were paid an average of 25 days late.

The Department's cash management regulations in 34 C.F.R. Part 668, Subpart K, set forth the rules and procedures under which a participating institution requests, maintains, disburses, and otherwise manages Title IV program funds. These regulations promote sound cash management of Title IV program funds by an institution, minimize the financing costs to the federal government in making Title IV program funds available to a student or an institution, and minimize the costs that accrue to a student. 34 C.F.R. § 668.161(a)(1).

These regulations specifically provide that with the exception of funds received by an institution for administrative expenses and funds used for the Job Location and Development Program under the FWS Program, funds received by an institution under the Title IV programs are held in trust for the intended student beneficiaries or the Secretary, and that the institution, as a trustee of federal funds, may not use or hypothecate (*i.e.*, use as collateral) Title IV program funds for any other purpose. 34 C.F.R. § 668.161(b).

Further, the fiduciary standard of conduct requires UIU to safeguard Title IV funds it receives as a participant in the Title IV programs and to ensure those funds are used only for the purposes for which those funds were intended. 34 C.F.R. § 668.82(a). Based upon the facts reported by UIU officials, UIU either used or permitted student Title IV credit balances funds to pay institutional debts, when these funds should have been paid to students nearly <u>six months ago</u>. In addition to the $200,000 swept by the bank presumably to pay delinquent UIU debts, UIU also failed to explain what happened to the remaining $553,374 in Title IV credit balance funds owed to its students. Students rely on Title IV credit balance funds to pay living expenses while they are enrolled at a post-secondary institution. By appropriating Title IV funds or by withholding them for months, UIU has violated its fiduciary duty to pay students their credit balances timely.

UIU has breached its fiduciary duty to its students and the Department and thus it cannot be trusted to administer the Title IV programs in accordance with regulations. The standard of conduct regulation at 34 C.F.R § 668.82(c) specifically states that the failure of a participating institution to administer the Title IV programs or to account for the funds it receives in accordance with the highest standard of care and diligence required of a fiduciary, constitutes grounds for an emergency action. As described below, UIU's brazen misuse of Title IV funds is further highlighted by its illegal draw of Direct Loan funds that it was not then entitled to receive.

## B. UIU ILLEGALLY DREW $43,524 IN DIRECT LOAN FUNDS

In addition to misusing Title IV loan proceeds that should have paid student credit balances, UIU drew down excessive Title IV loan funds through this system that were used to pay institutional obligations. As previously stated, the Department established cash management regulations in 34 C.F.R Part 668, Subpart K, to promote sound cash management of Title IV funds by an institution, minimize the financing costs to the federal government in making Title IV funds available to a student or an institution, and minimize the costs that accrue to a student. 34 C.F.R. § 668.161(a)(1). This system is designed to ensure that institutions have timely access to draw down student Title IV funds as needed to be paid to the students promptly. These regulations specifically provide that Title IV funds received by an institution are held in trust for the intended student beneficiaries or the Secretary, and that the institution, as a trustee of federal

funds, may not use or hypothecate (*i.e.*, use as collateral) Title IV funds for any other purpose. 34 C.F.R. § 668.161(b).

Institutions use the Department's G5 payment system to request payments, adjust drawdowns, and return funds. G5 provides continuous access to current grant and payment information, such as authorized amounts,[3] cumulative drawdowns, current available balances,[4] and payment histories. Institutions under the advance payment method receive an initial Direct Loan authorization prior to the first day of the award year (July 1) which is based on the institution's program disbursements from the previous award year. As an institution submits Direct Loan disbursement records, the Department's Common Origination and Disbursement ("COD") system[5] tracks the total accepted and posted amounts against the funds drawn and the institution's authorized amount. Increases to that authorization are made several times throughout the award year. If needed, the institution may also request a funding level increase to ensure Title IV program funds are available for it to draw in advance, for immediate needs, as long as there are no unsubstantiated funds for more than 30 days.

Each week the Department produces a G5/COD Balance Report to monitor Title IV program balances and identify institutions with balances that require further analysis and follow-up.[6] A detailed review of UIU's Direct Loan transaction history for the 2022-23 award year revealed that between June 23rd and June 27th, UIU entered disbursement records in COD totaling $14,653. This is the amount that UIU should have drawn on June 27, 2023, but instead, UIU drew $27,957 ($13,304 more than it was entitled to). UIU then proceeded to make several draws of Direct Loan funds knowing it did not have any corresponding active student disbursement records in the COD system to substantiate the drawdowns. In total, UIU hypothecated $43,524. The table below summarizes UIU's breach of its fiduciary responsibility by identifying each drawdown for which UIU hypothecated Direct Loan funds. Enclosure 6 provides additional details.

---

[3] An institution's authorization is the amount of Title IV program funds for which the institution is currently eligible. A separate authorization is maintained for each program by award year.

[4] An institution's available balance is the amount of cash the institution has available to draw down through G5. It is the difference between the authorized amount and the institution's net drawdowns to date.

[5] COD is the Department's software system that uses electronic records to exchange data with institutions. Institutions submit student-specific origination and disbursement records to substantiate Title IV program funds received.

[6] The G5/COD Balance Report identifies summary totals for authorizations, drawdowns, and disbursements from both the G5 and the COD systems for the Direct Loan program as well as several other Title IV grant programs. It also identifies institutions that may have "Unsubstantiated Funds > 30 Days" which can be an indication that an institution is out of compliance with cash management, disbursement reporting, and/or reconciliation requirements. Institutions are included on this report for all active program award years.

| Date of Draw | Amount Drawn | COD Disbursement Records | Unsubstantiated Amount | Payment Control No. |
|---|---|---|---|---|
| June 27, 2023 | $27,957 | $14,653 | $13,304 | 2023062608052 |
| June 28, 2023 | $8,289 | 0 | $8,289 | 2023062710125 |
| July 3, 2023 | $2,721 | 0 | $2,721 | 2023062918304 |
| July 10, 2023 | $8,821 | 0 | $8,821 | 2023070625881 |
| July 12, 2023 | $10,389 | 0 | $10,389 | 2023071029653 |
| TOTAL | $58,177 | $14,653 | $43,524 | |

As a result of the unsubstantiated Direct Loan balance, the COD Reconciliation Coordinator sent numerous emails between July 31st and September 18th, alerting UIU that it was out of compliance with applicable regulations and must either immediately return the unsubstantiated Direct Loan funds or substantiate the funds by submitting corresponding disbursement records. (Enclosure 7.) UIU, however, failed to take action to resolve the unsubstantiated funds; therefore, the matter was escalated to the School Reconciliation Partner Division (SRPD). SRPD staff sent an email on September 21, 2023, informing UIU of its violation and that it must resolve the unsubstantiated funds by October 5, 2023. The email reminded UIU that resolution of the matter involved submitting additional disbursement records or returning the funds (payment instructions were included in the email). You responded that same day stating that UIU would pay the unsubstantiated balance by October 5, 2023. (Enclosure 8). However, the balance was not returned as promised. Instead, UIU returned only $5,000 (approximately 11.5% of the balance). As a result, the Department issued a formal *Direct Loan Call for Cash Demand Letter* (Demand Letter) on October 6, 2023, demanding resolution of the balance no later than November 6, 2023. (Enclosure 9). Although UIU has paid a nominal amount of the balance owed, UIU breached its fiduciary duty when it obtained and then used for its own purposes $43,524 in Direct Loan funds for over three months and UIU has failed to repay the remaining balance of $38,524.

UIU expressly agreed in its PPA that as a fiduciary responsible for administering federal funds, if it was permitted to request funds under the Title IV program's advance payment method, it would time its requests for funds to meet only the institution's students immediate Title IV program needs. 34 C.F.R. § 668.14(b)(2).

Based upon the above-referenced facts, UIU, in violation of the applicable Title IV cash management regulations, knowingly drew down Direct Loan funds that it was not then entitled to receive. UIU breached its fiduciary duty to the Department and cannot be trusted to administer the Title IV programs in accordance with the Department's regulations. The emergency action regulation at 34 C.F.R. § 668.83(c)(2)(i) specifically identifies an institution's procurement of Title IV program funds in an amount that exceeds the amount for which its students are eligible as a violation of a Title IV program requirement that causes misuse and the likely loss of Title IV funds. An emergency action is therefore warranted.

Dr. Karen Schuster
Union Institute and University
Page 8

## C. Union Has Ceased Offering Instruction for Its On-Ground Programs

To continue participation in the Title IV programs, an institution must meet the Title IV standards of financial responsibility. 34 C.F.R. § 668.171(a). Under this standard, an institution must, among other things, provide the services described in its official publications and statements. 34 C.F.R. § 668.171(a)(1). An institution's failure to meet this standard is grounds for an administrative action. 34 C.F.R. § 668.171(i)(1).

An institution also loses its eligibility to participate in the Title IV programs if it ceases to provide educational programs for a reason other than a normal vacation period or natural disaster that directly affects the institution or its students. 34 C.F.R. §§ 600.40(a)(iii), 600.26(a)(1).

Per the institution's academic calendar published in its academic catalog, UIU was scheduled to start its Fall term for all of its on ground program offerings on August 28, 2023. However, reports in the media indicated that UIU had cancelled its Fall term. Following receipt of those media accounts, the Department immediately contacted UIU. During that conversation, Dr. Frederick confirmed that although the "Fall 1" term was initially delayed with a new start date of September 11, 2023, UIU subsequently decided to cancel instruction for the term. UIU provided the Department with a copy of its communication to students which was issued on September 8, 2023, and informed students that although "Fall 1" had been cancelled, "Fall 2" would begin on November 6, 2023, as scheduled. However, the note at the bottom of the communication stated, "Please note, these changes do not affect the Ph.D. or the TIES schedule." (Enclosure 10).

Because the communication to students noted that scheduled instruction was not affected for students in the Ph.D or TIES programs, the Department subsequently asked UIU to substantiate that courses in those programs continued to be taught during the "Fall 1" term. However, despite the Department's request, UIU provide no evidence of continued instruction in those programs during the "Fall 1" term.[7] When asked about the type of academic instruction for these schedules, Dr. Frederick stated in a September 12, 2023 email that the Ph.D. had a five-day residency in July 2023 followed by both synchronous and asynchronous instructional activities through December and that TIES uses Zoom to provide synchronous online instruction that is supported by asynchronous instruction.[8] (Enclosure 11).

In the absence of the evidence requested, UIU's claim that it is still providing instruction is entitled to little weight given the nature of the academic instruction described. Regardless, the facts that UIU cancelled its Fall 1 term, that UIU hasn't paid its employees since August 11, 2023, and that at least several staff have either resigned or been "let go" demonstrates that UIU has ceased to provide many, if not all, the educational services and/or instruction it promised to its students as described in its publications.

---

[7] UIU provided lists of currently enrolled students and faculty, but these "lists" do not demonstrate that instruction was occurring.

[8] UIU also clarified that TIES stood for The Institute for Educational Studies and that it was a Master's in Education in Montessori and Integrative Learning

Case 1:25-bk-10562-HRT Doc 28-2 Filed 04/16/25 Entered 04/16/25 15:17:11 Desc
Exhibit B-Alon Operative Complaint    Page 56 of 61

Dr. Karen Schuster Webb
Union Institute and University
Page 9

## II. UNION FAILS TO MEET THE STANDARDS OF FINANCIAL RESPONSIBILITY

To continue participation in the Title IV programs, an institution must meet the Title IV standards of financial responsibility. 34 C.F.R. § 668.171(a). Under this standard, an institution must have the ability to provide the services described in its official public cations and statements, meet all its financial obligations, and be current in its debt payments. 34 C.F.R. §§ 668.171(a), (b)(3). An institution's failure to meet this standard is grounds for an administrative action. 34 C.F.R. § 668.171(i)(1). As detailed below, UIU has repeatedly failed to meet its financial and debt obligations and therefore does not meet the Title IV standards of financial responsibility.

Despite receiving Title IV funds from the Department on behalf of students, UIU failed to disburse Title IV credit balance checks to students and confirmed to Department officials that said checks would "bounce" if issued. Given that UIU neglected to properly identify accounts containing Federal funds, its failure to disburse Title IV credit balances was compounded by its inability to pay its debts which resulted in a third party placing a lien on UIU's bank account and the bank subsequently sweeping $200,000 from the account.[9] UIU hypothecated[10] Title IV credit balances that were due to be paid nearly six months ago (in May 2023) and then, from June 27th – July 12th, illegally drew $43,524 in Direct Loan funds knowing that it did not have the corresponding student disbursement records to substantiate those funding draws. Although UIU returned a nominal portion of the unsubstantiated Direct Loan funds, the evidence clearly shows that UIU has retained for its own purposes $43,524 in unsubstantiated Direct Loan funds for over three months and still holds, without any authorization, the remaining balance of $38,524.

UIU's financial deterioration was further exposed in August 2023 through its failure to pay its employees. In September 2023, you confirmed that UIU was behind on payroll. (Enclosure 10) The payroll information that UIU subsequently provided revealed that UIU failed to pay 81 employees for the July 28, 2023, pay period and payroll has not been processed for the August 11th and August 25th pay periods. (Enclosure 12). Furthermore, UIU has not provided the Department with any evidence that these payment periods or any of the subsequent payment periods have been processed.[11] Also in September 2023, the SPD discovered that UIU had been locked out of its main campus located at 2090 Florence Avenue, Cincinnati, Ohio 45202-1925.[12] You subsequently provided a copy of a draft Forbearance Agreement which indicated that UIU had not paid its rent since February of 2023 and, as of August 2023, owed $449,535.99 in back rent. (Enclosure 13). Recent media reports also state that UIU assured employees that the institution was continuing their health insurance coverage, though at least some employees were notified that those benefits were canceled retroactive to June 30, 2023.[13] These facts, coupled with the cancellation of its "Fall 1" term, also demonstrate that UIU has ceased to provide, many,

---

[9] On September 5, 2023, you stated that the majority of UIU's accounts had a zero balance.
[10] As previously stated, UIU has failed to explain what happened to the remaining $553,374 in Title IV credit balances after the account was swept.
[11] September 8th, September 22nd, October 6th, and October 20th pay periods.
[12] UIU reported this address as its main campus when it submitted its recertification application on March 18, 2022.
[13] A University Called Off Fall Classes. Employees Aren't Being Paid. Now What? *The Chronicle of Higher Education,* October 10, 2023 (chronicle.com)

Case 1:25-bk-10562 Doc 28-2 #: Filed 04/16/25 Entered 04/16/25 15:17:11 #: Desc
Exhibit B-Alon Operative Complaint    Page 57 of 61

Dr. Karen Schuster Webb
Union Institute and University
Page 10

if not all, the educational services and/or instruction it promised to its students as described in its publications.

UIU is also in arrears on its payments for several short-term loans and has two lawsuits pending against it. INSTAFUNDERS, LLC filed a lawsuit against UIU on April 27, 2023, demanding $296,866.00 (Enclosure 14) and Cedar Advance, LLC filed a lawsuit against UIU on May 16, 2023, demanding $410,625.00 (Enclosure 15). Additionally, UIU is now more than 60 days past on its annual dues owed to its accrediting agency.

UIU's deteriorating financial situation imperils its ability to continue operations. As a result, the Department notified UIU on September 21, 2023, that it was required to submit an irrevocable Letter of Credit (LOC) in the amount of $12,075,546 on or before October 13, 2023.[14] (Enclosure 16). The Department has engaged in several communications with UIU seeking to clarify the institution's intentions regarding the submission of the required financial protection, with unclear answers by UIU. In any case, as of the date of this notice, UIU has not submitted the required LOC or other financial protection. UIU's inability to meet the Title IV financial responsibility standards and its deteriorating financial situation further underscores the need for this action.

## III. UIU IS NOT IN COMPLIANCE WITH ITS ACCREDITOR'S STANDARDS

Accreditation by a nationally recognized accrediting agency is one of the statutory requirements that an institution must meet to be eligible to participate in the programs authorized under Title IV of the HEA. 20 U.S.C. §§ 1001(a)(5), 1002(b)(1)(D), (c)(1)(B). Additionally, to begin and participate in any Title IV program, an institution must demonstrate that it its capable of adequately administering that program. 34 C.F.R. § 668.16. The Secretary does not consider an institution to have that administrative capability if a review by the institution's accrediting agency discloses significant problems. 34 C.F.R. § 668.16(j)(1).

On October 2, 2023, UIU's accrediting agency, the Higher Learning Commission ("HLC"), sent a letter notifying UIU that it was not in compliance with the "Obligations of Membership." (Enclosure 17). In particular, HLC received multiple institutional complaints in July and August of 2023 and UIU was given until September 8th and 24th to respond to those complaints, and the institution failed to respond. UIU was also required to submit a "Provisional Plan" with teach-out agreements no later than September 25th but failed to timely submit that plan. Moreover, UIU has failed to remit payment of its annual dues which is now more than 60 days past due and HLC recently confirmed in an email that UIU is past-due on other invoices as well.

This significant noncompliance reported by HLC is further evidence that UIU lacks the requisite administrative capability necessary to participate in the Title IV programs.

---

[14] This amount represents 100% of the Title IV funds received by the institution during its most recently completed fiscal year.

## IV. CONCLUSION

UIU's misconduct cited in this action represents multiple violations of Department regulations and the PPA that UIU entered into with the Department. UIU has misused Title IV funds to the detriment of its students, the Department, and the taxpayers. UIU's repeated failure to act as a fiduciary in administering federal funds creates serious risks that the funds will continue to be misused in the future in a similar manner. Further, UIU's failure to meet the financial responsibility standards establishes that Title IV funds will continue to be at risk if the Department does not act. UIU's serious misconduct has left the Department no choice but to impose this emergency action to prevent the further misuse of Federal funds.

**This emergency action is effective on the date of this letter,** which is the date of mailing, and will remain in effect until either a decision to remove the emergency action is issued in response to a request from UIU to show cause why the emergency action is unwarranted or until the completion of the termination action that is initiated by Part II of this notice. The terms of the termination action may supersede the provisions of this emergency action regarding the obligation and disbursement of Title IV program funds.

UIU may request an opportunity to show cause why this emergency action is unwarranted. To request an opportunity to show cause, please write and submit your request to me via the U.S. Postal Service or an express mail service at the following address:

Administrative Actions and Appeals Service Group
U.S. Department of Education
Federal Student Aid
830 First Street, NE (UCP-3, Room 92G4)
Washington, DC 20002-8019

If UIU requests a show cause hearing, my office will refer the case to the Office of Hearings and Appeals ("OHA"), which is a separate entity within the Department. That office will arrange for assignment of the case to an official, who will conduct the hearing. UIU is entitled to be represented by counsel at the hearing and otherwise during the show cause proceeding.

II.

The Department intends to terminate UIU's eligibility to participate in the Title IV programs for all the reasons stated in Part I of this notice. The Department is taking this termination action under the authority of 20 U.S.C. § 1094(c)(1)(F) and the Department's regulations at 34 C.F.R. Part 668, Subpart G, including 34 C.F.R. §§ 668.86, 668.95, and 668.97. Those regulations set forth the procedures and guidelines that the Department has established for terminating the eligibility of an institution to participate in any Title IV programs. Initiation of this termination action means that the emergency action will remain in effect until completion of the termination proceeding, unless the emergency action is otherwise lifted. 34 C.F.R. § 668.83(f)(1). The termination proceeding includes any appeal to the Secretary.

The eligibility of UIU to participate in the Title IV programs will terminate on November 27, 2023 unless we receive by that date one of the following: 1) a request for a hearing to be conducted by the Office of Hearings and Appeals; or 2) a request for reconsideration of the termination action by submitting written material indicating why the termination action should not be imposed.

If UIU chooses to request a hearing or to submit written materials, you must write to me at the address in Part I of this letter. If UIU requests a hearing, the case will be referred to the Office of Hearings and Appeals. That office will arrange for assignment of UIU's case to an official who will conduct an independent hearing. UIU is entitled to be represented by counsel at the hearing and otherwise during the proceedings. If UIU does not request a hearing, but submits material instead, the Department shall consider that material and notify you whether the termination will become effective, will be dismissed, or limitations will be imposed. The consequences of termination are set forth in 34 C.F.R. § 668.94.

III.

This is also to inform you that the Department intends to fine UIU $4,262,720 based on two of the violations set forth in Part I of this letter: 1) the illegal draw and hypothecation of Direct Loan funds without eligible disbursements supporting those draws and 2) the illegal retention of credit balances owed to students. This fine action is being taken in accordance with the procedures that the Secretary has established for assessing fines against institutions participating in any or all of the Title IV, HEA programs. 34 C.F.R. § 668.84. Title IV program regulations permit a fine of $67,544 for each such violation. In determining the amount of a fine, the Department considers the gravity of the offense and the size of the institution. 34 C.F.R. § 668.92.

In determining the size of an institution, the Department considers the amount of Title IV program funds received by or on behalf of students for attendance at that institution and compares that figure to the median funding for all institutions participating in the Title IV programs. The most recent year for which complete funding data is available to determine the median funding level for all Title IV recipients is 2021-2022. According to Department records, UIU received $10,021,111 in Direct Loan funds, $866,329 in Pell Grant funds, and $210,900 in campus-based funds during the 2021-2022 award year. The latest information available to the Department also indicates that the median funding level for institutions participating in the Direct Loan program during the 2021-2022 award year is $2,196,429, the median funding level for the Pell Grant program is $1,577,089, and the median funding level for the campus-based programs is $272,724. Accordingly, UIU is considered a large institution because its Direct Loan and campus-based funding levels exceed the median funding levels. Even though its Federal Pell Grant funding is lower than the median level for the 2021-2022 award year, this reflects that UIU has a smaller undergraduate population compared to its graduate student population and does not impact the Department's determination that UIU is a large institution. Given the funding level of the institution, the size of UIU does not warrant mitigation of the fine amount.

Dr. Karen Schuster
Union Institute and University
Page 13

In determining the number of violations, the Department has determined that each instance of the unpaid credit balances since May 2023 constitutes a violation. Further, each draw of Direct Loan funds that was not supported by eligible disbursements to students constitutes a separate violation.

In considering the gravity of the offense, these violations are severe and have caused significant harm to students and loss to the Department. As described above, both of these violations demonstrate an extreme lack of fiduciary responsibility. The institution drew federal funding amounts on five separate occasions without supporting disbursements. The repeated nature of this violation is a factor supporting the maximum fine per violation. Although UIU returned a nominal portion (11 percent) of what was illegally procured, nearly 90% of the unsubstantiated funds remain in UIU's possession. Although UIU has acknowledged that it owes these funds to the Department, the institution's delay in returning funds for which it is not eligible and for which it has held since late June/early July (four months) further supports fining the maximum amount for these violations.

With regard to the unpaid credit balances, 157 students failed to receive $753,374 in loan proceeds to pay for living expenses. Of these students, 94 (84% of the students) failed to receive amounts of at least $1,000, 16 students (25% of the students) failed to receive at least $5,000 and 23 students (15% of the students) failed to receive at least $10,000. Given that the students still have not received these funds they are being charged interest on these amounts as part of their Direct Loan balance yet were unable to utilize those funds to pay costs for which the loans were taken. Some of these amounts have been unpaid since mid-May 2023. Of the 157 students owed credit balances yet to be paid, 84 (53.5% of the students) have been waiting between at least 153 to 169 days for these funds. There are 10 students (6% of the students) who have been waiting between at least 123-152 days, 54 students (34% of the students) who have been waiting between at least 92 and 122 days for funds, and the remainder, 11 students (7% of the total), have been waiting at least 60 days for the funds they were owed. UIU's failure to provide students the funds for the purposes for which they were intended both harms students and violates the institution's fiduciary duty. While the institution provided the Department with the required data to demonstrate a significant failure to pay credit balances, they did not provide this information until the Department was alerted to the issue based on complaints. Additionally, these unpaid credit balances represent a recurrence of issues uncovered and purportedly resolved only a month prior. Further, to date, UIU has made no progress to pay any of the outstanding credit balances. The loss to the Department has essentially only been mitigated by the Department's placement of UIU on HCM2 and the current action to terminate the institution's participation in the Title IV programs. Given the severity of these violations a significant fine is warranted; however, given that this fine action is paired with an action to end UIU's eligibility, future harm to the Department will be mitigated, which serves to support a fine per violation at less than the maximum.

Therefore, the Department has set the following fine amounts:

A. For UIU's illegal draw and hypothecation of $43,524 in Direct Loan funds, the Department has set the fine amount at $337,720. This represents $67,544 for each of the five Direct Loan

drawdowns the UIU made knowing it did not have the corresponding active student disbursement records in the COD system to substantiate the drawdowns.

B. For UIU's illegal hypothecation of Title IV credit balance funds, the Department has set the fine amount at $3,925,000. This represents $25,000 for each of the 157 students who have not received their Title IV credit balance funds.

The $4,262,720 fine will be imposed on November 27, 2023, unless, by that date, we receive a one of the following: 1) a request for a hearing to be conducted by OHA; or 2) a request for reconsideration of the fine action by submitting written material indicating why the fine should not be imposed.

If UIU chooses to request a hearing or to submit written materials, you must write to me at the address in Part I of this letter. If UIU requests a hearing, the case will be referred to OHA. That office will arrange for assignment of UIU's case to an official who will conduct an independent hearing. UIU is entitled to be represented by counsel at the hearing and otherwise during the proceedings. If UIU does not request a hearing, but submits material instead, the Department will review that material and notify UIU of the amount of the fine, if any, that will be imposed.

IV.

**ANY REQUEST FOR A HEARING OR WRITTEN MATERIAL THAT UIU SUBMITS MUST BE RECEIVED BY NOVEMBER 27, 2023, OTHERWISE, THE TERMINATION AND FINE WILL BE IMPOSED ON THAT DATE.**

If you have any questions or desire any additional explanation of UIU's rights with respect to these actions, please contact Kerry O'Brien of my staff at ▮▮▮▮▮▮

Sincerely,

Susan D. Crim, Director
Administrative Actions and Appeals Service Group

Enclosures

cc:   Barbara Gellman-Danley, President, HLC, via email at president@hlcommission.org
Randy Gardner, Chancellor, Ohio Department of Higher Education, via email at ▮▮▮▮▮
Stephanie McCann, Associate Vice Chancellor, Ohio Department of Higher Education, via ▮▮▮▮▮
Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov